UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| PHOENIX OF BROWARD, INC. on Behalf of Itself and Similarly Situated Burger King® Franchisees, | ) ) ) ) | Case No. 1:06-CV-0394-CAP |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| McDONALD'S CORPORATION, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
McDONALD'S RULE 12(b)(6) MOTION TO DISMISS**

## I.    INTRODUCTION

Plaintiff's lawsuit is a gratuitous and improper attempt to capitalize on McDonald's misfortune.  In August 2001, the FBI exposed a criminal fraud ring in which an employee of a long-time McDonald's vendor embezzled high-value pieces in the games McDonald's periodically ran in its restaurants and distributed them to a network of fraudulent "winners."  McDonald's was not involved in this criminal behavior and was publicly identified by the FBI as a *victim* of this fraud. Nonetheless, as a result of the criminal corruption of its games, McDonald's suffered severe public backlash and was sued in more than 40 consumer class actions throughout the United States and Canada.  Now, four-and-a-half years later, Plaintiff Phoenix of Broward, a Burger King franchisee, has sued McDonald's for "false advertising" under the Lanham Act.

Plaintiff's theory of liability is unprecedented.  Plaintiff claims that when McDonald's game pieces were stolen, McDonald's advertising was rendered "false" because its ads told consumers that they had a chance to win certain high-value prizes that were unavailable due to the theft.  Plaintiff further claims that it was harmed because McDonald's advertising allegedly caused consumers to eat at McDonald's when they otherwise would have eaten at Burger King.  Never before has a company brought a Lanham Act claim against a competitor whose advertising allegedly became "false" or "misleading" *solely* because of the felonious conduct of third parties.  There is good reason for this.  Plaintiff's theory not only would create an unfair result, but is also unsustainable as a matter of law.

Plaintiff's one-count complaint for false advertising under the Lanham Act should be dismissed for three, independent reasons.  First, Plaintiff lacks standing to bring it.  Federal courts employ a five-factor test in determining whether Lanham Act plaintiffs have prudential standing to sue for false advertising.  As explained in detail below, all five of these factors weigh *against* a finding of prudential standing in this case.

Second, the criminal conduct of the thieves who stole McDonald's game pieces is an intervening cause that severs any possible liability on the part of McDonald's.  Numerous courts have held that basic tort concepts apply in assessing the scope of liability under the Lanham Act.  Here, applying the doctrine of intervening cause is consistent with the goals and policies behind the Act because it limits liability to those companies that try to influence consumers with unsubstantiated claims – as opposed to companies whose innocent advertising becomes "false" due to the criminal conduct of others.  Applying the doctrine in

this case, the Court should find that the intervening, criminal behavior of the game piece embezzlers cuts off any potential liability of McDonald's.

Third, Plaintiff's complaint should be dismissed because Plaintiff failed to plead its Lanham Act claim with the specificity required by Federal Rule of Civil Procedure 9(b). Because a false advertising claim under the Act is akin to a claim for fraud, courts routinely hold that plaintiffs must satisfy the heightened pleading requirements of Rule 9(b) in order to survive dismissal. Here, Plaintiff has provided *none* of the specific detail the rule requires. Thus, the Court should dismiss its complaint.

## II.   **FACTUAL BACKGROUND**[1]

For years, McDonald's has offered customers and the general public the opportunity to participate in various games and contests. (Compl. ¶¶ 15-16). The vast majority of the prizes awarded in these games have been "low-value" prizes consisting of food and beverage items and low-dollar cash awards. (*Id.* ¶ 17). The games also offer participants the opportunity to win "high-value" prizes, such as cars and cash awards up to $1 million. (*Id.*). Recently, many of McDonald's games have included two million-dollar prizes – an "instant winner," won by obtaining an instant winning game piece, and a "collect-to-win," obtained by collecting certain game pieces and matching them with others. (*Id.*).

Plaintiff's complaint alleges that for nearly 20 years prior to August 2001, McDonald's engaged a company called Simon Marketing, Inc. ("Simon") to

---

[1]   McDonald's recognizes that the Court must accept as true all well-pleaded allegations in Plaintiff's complaint in deciding the instant motion. Thus, while certain allegations are patently false – such as Plaintiff's charge that McDonald's paid $16 million in settlement to Simon Marketing – these falsehoods are irrelevant for now.

operate its games. (Compl. ¶ 21). During the relevant time period, Simon was entrusted with the sole responsibility to "seed" the games by randomly placing winning game pieces into the stream of commerce. (*Id.* ¶ 22). Unfortunately, an employee of Simon abused this trust. Beginning in approximately 1995, Simon's director of security, Jerry Jacobson, "began a conspiracy to fix [McDonald's] games by directing rare winning high-value game pieces to fellow conspirators," who then would fraudulently redeem the corresponding prizes. (*Id.*). According to Plaintiff, this "sophisticated criminal ring" resulted in "upwards of $25 million [in] high-level prizes [being] wrongfully diverted from [McDonald's] contests" over a six-year period. (*Id.* ¶¶ 1-2).

Plaintiff does *not* allege that any employee of McDonald's was involved in this criminal ring. Rather, it concedes that McDonald's was victimized by a third party who abused his position of trust and committed numerous criminal acts against McDonald's and the general public. Moreover, Plaintiff does not dispute that Jacobson stole only "certain" high-value game pieces and that, with the exception of these pieces, the games operated as intended and the public received millions of dollars in prizes. (Compl. ¶ 11).

On August 21, 2001, the FBI announced that it had arrested Jacobson and several other individuals, charging them with conspiring to criminally compromise McDonald's games through the embezzlement and fraudulent redemption of winning game pieces. (*Id.* ¶ 26). By December 2001, 51 individuals had been indicted in the Middle District of Florida for their involvement in the conspiracy. Of these 51 individuals, 50 of them – including Jacobson – either pled guilty or were convicted following a federal criminal trial in Jacksonville, Florida. (*Id.* ¶ 27).

The day after the FBI's announcement, consumers began filing civil actions against McDonald's all over the country, alleging claims for consumer fraud, negligence, unjust enrichment, and a host of related torts.  On April 19, 2002, McDonald's settled these class actions by, among other things, agreeing to implement a $15 million Instant Giveaway, providing class members and the general public with an opportunity to win fifteen, $1 million prizes.  (*Id.* ¶ 2).

In the end, far from obtaining "windfall profits" as a result of the corruption of its games (*id.* ¶ 12), this highly publicized incident caused considerable harm to McDonald's reputation and goodwill, in addition to the substantial costs McDonald's incurred to resolve the dozens of lawsuits that followed in the wake of the government investigation.  (*Id.* ¶ 2).  Now, four-and-a-half years after the FBI's announcement, Plaintiff has decided to sue McDonald's because McDonald's "has never seen fit to compensate any of its competitors for the losses they suffered as a result of McDonald's unfair competition."  (*Id.* ¶ 3).  McDonald's, however, never *engaged* in any unfair competition – it was a fraud victim, and Plaintiff has not alleged otherwise.  As explained below, this fact dooms Plaintiff's case.

## III.   ARGUMENT

### A.    Legal Standard

"Federal Rule of Civil Procedure 12(b)(6) empowers the Court to grant a defendant's motion to dismiss when a complaint fails to state a claim upon which relief can be granted."  *Smith v. Delta Air Lines, Inc.*, No. 1:04 CV 2592, 2006 WL 855777, at *11 (N.D. Ga. Mar. 31, 2006).  Although all well-pleaded facts must be accepted as true, the court need not accept as true any legal conclusions couched as factual allegations.  *Id.*  In addition, conclusory allegations and unwarranted deductions of fact are not accepted as true.  *Id.*  Motions to dismiss should be

granted where the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).

**B.     The Complaint Should Be Dismissed Because Plaintiff Lacks Prudential Standing To Bring A Lanham Act Claim**

Plaintiff's Lanham Act claim fails as a matter of law because Plaintiff lacks standing to bring it.  It is well-settled that Lanham Act cases should be dismissed for lack of prudential standing where, as here, the plaintiff's injury is attenuated, its damages are highly speculative, and there exists a class of persons who are better suited to vindicate the public interest – here, the millions of consumers who played McDonald's games.

Standing has two components.  The traditional component refers to Article III standing, which requires a plaintiff to show: 1) an injury in fact; 2) that is fairly traceable to the actions of the defendant; 3) that likely will be redressed by a favorable decision.  *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) ("*P&G*").  "Article III standing imposes constitutional limitations on the jurisdiction of the federal courts."  *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. 3:02-CV-2727-G, 2004 U.S. Dist. LEXIS 6678 at *39 (N.D. Tex. Apr. 19, 2004).

In addition to these constitutional requirements, federal courts adhere to a second standing component that is based on a set of "prudential" considerations. The goal of the prudential standing inquiry "is to determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'"  *P&G*, 242 F.3d at 560 (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)).  By imposing these judicially

created standing requirements, courts "avoid deciding questions of broad social import where no individual rights would be vindicated" and "limit access to the federal courts to those litigants best suited to assert a particular claim." *Id.* at 560 n.43 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985)).

Courts employ a five-factor test to determine whether a plaintiff has prudential standing to bring a Lanham Act claim. This test examines: 1) the nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of [the Lanham Act]?"; 2) the directness or indirectness of the asserted injury; 3) the proximity or remoteness of the party to the alleged injurious conduct; 4) the speculativeness of the damages claim; and 5) the risk of duplicative damages or complexity in apportioning damages. *Id.* at 562-63; *Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 233 (3d Cir. 1998). Courts apply these factors on a case-by-case basis without giving any one of them determinative weight. *Joint Stock Soc'y v. UDV North Am.*, 266 F.3d 164, 180 (3d Cir. 2001). Thus, a court may dismiss a Lanham Act case for lack of prudential standing even where some of the five factors weigh in favor of a finding that standing exists. *See, e.g., MCW*, 2004 U.S. Dist. LEXIS 6678 at *47 (dismissing Lanham Act claim for lack of prudential standing where only three factors favored such a holding); *Cook Drilling Corp. v. Halco Am., Inc.*, 71 U.S.P.Q.2d 1596, 2002 U.S. Dist. LEXIS 903, at *30-*31 (E.D. Pa. 2002) (same).

Here, *none* of the five factors set forth above weighs in favor of a finding that Plaintiff has prudential standing. Accordingly, Plaintiff's one-count complaint against McDonald's should be dismissed.

### 1.     Plaintiff's Purported Injury Is Not The Type Of Injury That Congress Sought To Redress In The Lanham Act

The first prudential standing factor examines whether the Plaintiff's alleged injury "is of a type Congress sought to redress in providing a private remedy under the Lanham Act." *P&G*, 242 F.3d at 563. Here, the injury complained of by Plaintiff – lost sales due to advertising that allegedly was rendered "false" by third-party, criminal conduct – plainly is not.

Courts applying the first prudential standing requirement to the Lanham Act have noted that the Act has two foci. First, it is aimed at vindicating "commercial interests [that] have been harmed by a competitor's false advertising;" second, it is a means of "securing to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." *Id.* at 563. Redressing Plaintiff's purported injuries in this case would further neither of these goals.

With respect to Plaintiff's commercial interests, "the primary focus of the Lanham Act is on commercial harms that result from anti-competitive behavior." *Ford v. Nylcare Health Plans of the Gulf Coast, Inc.*, 301 F.3d 329, 337 (5th Cir. 2002) (Benavides, J., concurring). Here, however, McDonald's conduct was in no way anti-competitive. McDonald's was the victim of a criminal fraud scheme. To the extent that any of its advertising was "false," as alleged in the complaint, it was false only because of the intervening, criminal conduct of Jerry Jacobson and his co-conspirators. As such, McDonald's conduct plainly is not the type that Congress was intending to redress when it passed the Lanham Act.

Moreover, the alleged injuries to Plaintiff's commercial interests "are not *competitive* in nature" because the advertising at issue did not tout the products and

services of McDonald's or disparage the products and services of Burger King. *MCW*, 2004 U.S. Dist. LEXIS 6678 at *43; *see also Conte Bros.*, 165 F.3d at 234 ("As the District Court stated, 'plaintiffs do not allege that defendants ran advertisements that said 'don't buy engine additive at Conte Brothers or Hi/Tor – instead, buy Slick 50 directly from the manufacturer.''"); *Cook Drilling*, 2002 U.S. Dist. LEXIS 903 at *19 (finding a lack of prudential standing and noting that "Cook does not contend that defendants' alleged misrepresentation regarding the manufacture of the DTH hammer either directly or indirectly impugned Cook as a commercial driller, or extolled the virtues of a different commercial driller."). Again, there is no allegation in this case that McDonald's conducted its sweepstakes to malign Burger King or to compete unfairly.  McDonald's, like its customers, was a victim of the third-party, criminal conduct of Jerry Jacobson.

As for the second focus of the Lanham Act, Plaintiff has neither alleged nor suggested that its reputation somehow was adversely affected by McDonald's advertising.  Plaintiff does not allege that there were *any* statements, much less false statements, made about Burger King.  This lack of any reputational injury is a common theme in Lanham Act cases that have found a lack of prudential standing. *See, e.g., Conte Bros.*, 165 F.3d at 234 ("The type of injury suffered by Appellants – loss of sales at the retail level because of alleged false advertising – does not … detract from the Appellants' reputation or good will"); *P&G*, 242 F.3d at 563 ("P&G has alleged attenuated harm arising from the alleged fraudulent inducements but not alleged loss of good will or reputation"); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, No. 1-CV-2059, 2005 U.S. Dist. LEXIS 9489 at *11 (D.N.J. Jan. 25, 2005) (granting motion to dismiss for lack of prudential standing, in part, because there was no allegation that the alleged false claims "have or will

detract from [defendant's] commercial reputation or good will"). Here, if there has been any harm to reputation resulting from Jacobson's fraud, it has been *McDonald's* reputation that has suffered, not Burger King's.

Thus, taken together, the non-competitive nature of McDonald's conduct and the lack of any injury to Plaintiff's reputation or goodwill weighs heavily against a conclusion that Plaintiff has prudential standing under the Lanham Act.

### 2. Plaintiff's Alleged Injury Is Too Indirect To Justify Prudential Standing

The second factor, directness of the alleged injury, also weighs against a finding of prudential standing. In evaluating this factor, courts look to whether the claimed harm is attenuated or derivative of a harm to others. *MCW*, 2004 U.S. Dist. LEXIS 6678 at *46.

Here, Plaintiff's purported injury is based on the highly speculative notion that customers who would have eaten at Burger King decided, instead, to eat at McDonald's solely because of the lure of winning one of a few high-value prizes that – because of the fraudulent behavior of Jerry Jacobson and others – consumers had no chance to win. This harm is too attenuated to support prudential standing. As the court explained in *MCW*:

> [Plaintiff]'s claimed harm is attenuated in that it is alleged to come from lost sales to potential customers. If standing is allowed here, one could argue that any non-competitor's deceptive acts that further its business and harm another by causing it to lose potential customers could be sued upon as a violation of the Lanham Act. *See* [*Procter & Gamble*, 242 F.3d at 563]. It would not be prudent to open up standing to this extent.

*Id.*

*Procter & Gamble* is similarly instructive.  In *P&G*, the lead plaintiff and lead defendant (Amway) were manufacturers and distributors of household products that directly competed with one another.  P&G brought a Lanham Act false advertising claim based on the theory that the defendants allegedly harmed sales of its products "by inducing people to become Amway distributors and consumers by luring them into an illegal pyramid scheme and misleading them as to the financial rewards of selling Amway."  *P&G*, 242 F.3d at 544.  Thus, the misrepresentations allegedly kept people from working for P&G and buying its products.

The Fifth Circuit rejected this theory of liability and affirmed the dismissal of P&G's Lanham Act claim for lack of prudential standing.  In addressing the second factor, the court found that the alleged harm was simply too remote because there was no reason to think that any of the prospective employees would have worked for P&G absent the alleged misrepresentations:

> [T]he attenuated claimed harm is alleged to come from the fact that an increase in sales of Amway products eventually will lead to lower sales for its competitor.  If standing is allowed here, one could argue that any competitor's fraudulent act in running its business that gives it an advantage could be sued upon as a violation of the Lanham Act.  Opening up standing to this extent would not be prudent.

*Id.* at 563.

The same logic applies here.  Plaintiff alleges that consumers would have eaten at Burger King, instead of McDonald's, had they known that one or two of the high-value prizes in a particular game were unavailable (even though all other prizes could be won).  Thus, Plaintiff's theory depends not on actions or statements of McDonald's that directly harmed Burger King, but instead on the state of mind

of consumers that allegedly impacted sales at Burger King restaurants. This attenuated claim of harm that McDonald's allegedly false advertising increased its sales – "lead[ing] to lower sales for its competitor" – is simply insufficient to create prudential standing. As in *P&G*, if Plaintiff is allowed standing here, then any act by any person or entity that gives a competitor an advantage in the marketplace would subject the competitor to liability under the Lanham Act. This is not the law, nor should it be. Thus, the second factor also counsels against a finding of prudential standing in this case.

### 3. McDonald's Consumers Are Better Suited Than Plaintiff To Vindicate The Public Interest

The third factor, the proximity of the party to the alleged injurious conduct, also weighs against a finding of prudential standing. This factor requires a court to determine whether there is "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest," thus "diminish[ing] the justification for allowing a more remote party . . . to perform the offices of a private attorney general." *P&G*, 242 F.3d at 563 (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983)).

Here, there unquestionably is an identifiable class of persons who were directly injured by Jacobson's criminal conduct and who already have vindicated the public interest. In the wake of the FBI's announcement that Jacobson and his co-conspirators had stolen a small number of high-level prizes from McDonald's games, consumers filed more than 40 state and federal class action lawsuits against McDonald's. This litigation ultimately culminated in a settlement that returned to

the consuming public all of the prize money that consumers had been unable to win as a result of the criminal corruption of McDonald's games.

Plainly, then, this is not a case where the court must strain to find a hypothetical group of plaintiffs that could step in to vindicate the public interest. Rather, as Plaintiff concedes, McDonald's already has "settled multiple class action lawsuits on behalf of consumers" relating to the games conspiracy. (Compl. ¶ 2). As such, this third factor weighs heavily in favor of a finding that Plaintiff lacks prudential standing. *See P&G*, 242 F.3d at 563-64 (affirming denial of prudential standing where distributors – who were "more immediate to the injury than is P&G" but lacked standing to sue under the Lanham Act because they were consumers – could vindicate the public interest by suing for fraud).

### 4. Plaintiff's Damages Are Too Speculative To Justify Prudential Standing

The fourth factor, the speculativeness of the damages, also undercuts prudential standing. Plaintiff concedes in its complaint that only certain "high-level prizes" were "wrongfully diverted" from McDonald's games. (Compl. ¶ 2). It cannot dispute the fact that McDonald's gave away millions of prizes in its contests and that well over 99% of its game participants received exactly the prizes that they would have received absent any third-party criminal conduct. Nonetheless, Plaintiff's theory is that some segment of the public that was planning to patronize Burger King opted instead to go to McDonald's *solely* because they were seeking to win a high-level prize in one of McDonald's games.

The highly speculative nature of this theory is manifest. There obviously are countless reasons why a consumer decides to visit one quick service restaurant over another. These reasons range from the location of the restaurants to the menu

items offered, the prices charged, the length of the drive-thru line, the décor of the building and the existence of a playground or other amenities, just to name a few. There also is no uniform reason that a consumer chooses to visit a particular quick service restaurant at a particular time. The notion that Plaintiff will be able to prove that some ascertainable number of consumers actually saw or heard a McDonald's advertisement and visited McDonald's for the specific purpose of winning one of the few prizes that were affected by Jacobson's fraud without relying on speculation is difficult to imagine. But the idea that Plaintiff will be able to isolate specific lost profits – i.e., to prove that if consumers had not been influenced by allegedly false advertising, they would have eaten at Burger King instead of McDonald's, Wendy's, Arby's, Hardee's, Chick-fil-A, or a host of other quick service or other restaurants (or at home) – is unfathomable. The fact that the games took place over a period of several years in many geographic markets, both inside and outside the United States, will only complicate matters further.

It is important to remember that Jacobson and his co-conspirators embezzled and fraudulently redeemed only a very small number of the high-value, winning game pieces in McDonald's games. The overwhelming majority of the prizes were properly won and redeemed. Plaintiff's claim is thus dependent on showing first that consumers *saw* the complained-of advertising and, then, that they altered their purchasing habits to go to McDonald's, instead of Burger King, *only* because they had a one in several-hundred-million chance to win a million-dollar grand prize. This is speculation in the extreme.

Courts do not hesitate to deny Lanham Act plaintiffs prudential standing in cases, like this one, where the damages claimed are highly speculative. *See, e.g., P&G*, 242 F.3d at 564 (affirming denial of prudential standing, in part, because

"[g]iven the hundreds of P&G products and potential competitors, as well as the difficulty of determining what percentage of Amway's distributors were fraudulently induced to work for Amway, it is hard to see how any damages awarded would not be highly speculative."); *Joint Stock*, 266 F.3d at 183 (affirming denial of prudential standing, in part, because of the "extremely speculative" nature of plaintiff's lost profits theory).   Thus, this factor, like the others discussed above, demonstrates that Plaintiff lacks standing.

> **5.   Granting Plaintiff Standing Would Create The Risk Of Duplicative Damages, And Any Alleged Damages Would be Too Complex to Compute**

The fifth factor – the risk of duplicative damages or the complexity in apportioning damages – militates strongly against prudential standing.   If this Court were to conclude that Plaintiff has standing, it could engender copycat suits by each and every one of McDonald's many direct competitors, each of which could seek broad and overlapping damages, and others who do not even qualify as direct competitors.   The requirement of prudential standing is designed to prevent precisely such a result.

This principle is aptly illustrated in *Conte Bros*.   There, the court noted that, "under Appellant's theory, every corner grocer in America alleging that his sales of one brand of chocolate bars have fallen could bring a federal action against the manufacturer of another brand for falsely advertising the chocolate content of its product."   *Conte Bros.*, 165 F.3d at 235; *see also Kis v. Foto Fantasy, Inc.*, 240 F. Supp. 2d 608, 616 (N.D. Tex. 2002) ("prudential standing is lacking under the fifth factor because if standing were allowed here, 'every competitor in the market [could] sue' Defendants.") (citation omitted).   Such an action, "could result in an

enormous number of relatively insignificant cases being litigated" and "hardly seems befitting of a statute that was designed primarily to resurrect the federal tort of unfair competition." *Id.*

The same concern obviously exists here. If a Burger King franchisee is allowed to sue McDonald's over advertising that allegedly was rendered false by the criminal conduct of a third party, that concerns an ancillary activity like McDonald's games, and that was not directed at any specific competitor and did not even tout McDonald's goods or services, what is to stop countless other competitors from similarly filing suit over the same conduct? The risk of duplicative damages, especially given Plaintiff's inherently speculative damages claim, would be tremendous. And any attempt to apportion damages among the dozens of competitors who could come forward and claim that *their* restaurants are the ones consumers would have patronized had it not been for McDonald's advertising would be impossible to sort out.

To illustrate, suppose there is a town with five quick service restaurants – a McDonald's, a Burger King, a Wendy's, a Hardee's and an Arby's. Each competitor can make the claim that *it*, not Burger King, was aggrieved by the advertising at issue in this case. Thus, all four could sue, claiming that consumers would have patronized *their* franchises if the public had not been "misled" by statements concerning McDonald's games. Moreover, what is to stop the local grocer from claiming that consumers would have stopped by to purchase lunch meat so they could make their own sandwiches if not for McDonald's advertising? Or the government from claiming that game participants otherwise might have used their money to play the lottery? There is simply no end to the list of potential

plaintiffs that could try to capitalize on McDonald's misfortune of being the victim of a criminal fraud ring.

In the end, granting prudential standing in this case "would result in a great increase in marginal litigation in the federal courts and would not serve the underlying purposes of the Lanham Act – to ferret out unfair competition methods and protect businesses from the unjust erosion of their goodwill and reputation." *P&G,* 242 F.3d at 564 (citing *Conte Bros.*, 165 F.3d at 236). All five of the factors discussed above weigh solidly *against* the notion that Plaintiff has prudential standing to bring its Lanham Act claim. Any injuries it purportedly sustained do not stem from any anticompetitive conduct, they are indirect and highly attenuated, consumers already have vindicated the public interest by litigating against McDonald's, Plaintiff's damages are enormously speculative, and granting Plaintiff standing would open the door to countless additional lawsuits, which would make calculating damages a practical impossibility.

Because Plaintiff lacks standing to proceed on the only claim set forth in their complaint, the Court should dismiss this case with prejudice.

## C.   Jacobson's Theft Is An Intervening Cause That Cuts Off Liability To McDonald's

As noted above, Plaintiff's lawsuit is unprecedented. Exhaustive research has turned up no other case – reported or unreported, in any jurisdiction, at any time – where a competitor attempted to use the Lanham Act to impose liability on a rival whose advertising allegedly was rendered false by a wide-reaching criminal fraud ring. To be sure, there would have been nothing even arguably "false or misleading" about McDonald's advertising were it not for the criminal conduct of

Jerry Jacobson and his co-conspirators. Plaintiff's allegations concede this point. (*See, e.g.,* Compl. ¶ 22).

Under such circumstances, Plaintiff should not be allowed to recover because Jacobson's superseding, criminal behavior severed any liability of McDonald's. While the doctrine of superseding or intervening cause does not appear to have been applied in any prior Lanham Act cases, this obviously is a case of first impression. As noted above, no prior plaintiff has attempted to sue a competitor for false advertising when that competitor was the *victim* of a crime. Moreover, several other common law doctrines, not referenced in any way in the Lanham Act itself, have been read into the statute because they are consistent with the policies and principles behind the Act. The doctrine of intervening cause similarly should be applied to the Act.

Numerous courts have held that basic tort liability principles apply to federal statutes like the Lanham Act. As the Third Circuit has noted:

> The Lanham Act is derived generally and purposefully from the common law of unfair competition, and its language parallels the protections afforded by state common law and statutory torts.... The Act federalizes a common law tort. In construing the Act, then, courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability.

*AT&T Co. v. Winback Conserve Program, Inc.*, 42 F.3d 1421, 1433-35 (3d Cir. 1994) (citing cases). Applying this maxim, the *Winback* court held that basic agency principles, such as vicarious liability and actual and apparent authority, apply in Lanham Act disputes. *Id.* at 1433-34. Other cases are in accord. *See, e.g., David Berg and Co. v. Gatto Internat'l Trading Co.,* 884 F.2d 306, 311 (7th Cir. 1989) (applying tort principle of joint tortfeasor liability to Lanham Act unfair

competition claim); *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1148 (7th Cir. 1992) (approving "turn[ing] to the common law to guide our inquiry into the appropriate boundaries of [Lanham Act] liability").

As a general rule, "the applicability of common law doctrines in litigation under federal statutes depends on whether those principles advance the goals of the particular federal statute involved." *Winback*, 42 F.3d at 1429 (citations omitted). The goal of the false advertising prong of the Lanham Act is to "prohibit[] companies from making unsubstantiated claims in order to influence the purchasing decisions of the buying public." *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F. Supp. 194, 205 n.12 (D.D.C. 1989). Thus, it is consistent with the goal of the Lanham Act to limit liability to those companies who are trying to influence consumers with unsubstantiated claims about their products or services, *not* to open up liability to companies whose perfectly truthful advertisements allegedly were "rendered false" by the intervening, criminal conduct of third parties.

"[T]he common law is clear that certain intervening events – called 'superseding causes' – are sufficient to sever the causal nexus and cut off all liability." *See Archer v. Warner*, 538 U.S. 314, 326-27 (2003) (Thomas, J., dissenting), *citing Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 837 (1996). This concept applies with even greater force when the intervening cause is criminal in nature. *See Roach v. Dental Arts Lab., Inc.*, 79 S.W.3d 265, 268 (Tex. App. 2002) ("As a general rule, a third party's criminal conduct is a superseding cause that extinguishes the liability of the previous actor.") (citing Restatement (Second) of Torts § 448 (1965)).

The doctrine of intervening cause has been applied not only in negligence actions, but to various fraud and unfair competition statutes that resemble the

Lanham Act. *See, e.g., Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 12-13 (Ill. App. Ct. 2001) (stating in consumer fraud case that "the proximate cause analysis demands a determination that no intervening cause broke the chain of proximate causation between the allegedly fraudulent statements and the purchase."); *Wheaton Van Lines, Inc. v. Mason*, 925 S.W.2d 722, 729 (Tex. App. 1996) (moving company's advertisements could not sustain consumer fraud claim where the criminal act of rogue employee "was an intervening cause sufficient to break the chain of causation").

When this familiar tort principle is applied to the facts of this case, it is clear that the criminal acts of Jacobson break any possible causal nexus between McDonald's advertising and Plaintiff's purported harm. But for Jacobson's theft, the game pieces would have been randomly inserted into the stream of commerce in the ordinary course of business. It was *solely* due to his criminal acts that the game pieces were not properly circulated and consumers did not have an opportunity to win the corresponding prizes. Limiting McDonald's liability in this respect is entirely consistent with the Lanham Act, which does not impose liability for statements that *become* false or misleading *after* they are made. Indeed, as one court noted, the Act only "prohibits claims that are false or misleading *at the time they are made*. Post facto evidence cannot make actionable true claims which later become false." *Alpo*, 720 F. Supp. at 205 n.12 (emphasis in original).

In the end, Jacobson's intervening, criminal act of embezzling high-level game pieces and funneling them to fraudulent "winners" is a superseding cause of Plaintiff's alleged injury that severs the liability of McDonald's. Accordingly, Plaintiff's Lanham Act claim should be dismissed.

**D.    Plaintiff's Complaint Should Be Dismissed Because Plaintiff Failed To Comply With Rule 9(b)'s Heightened Pleading Requirements**

Plaintiff's case is also subject to dismissal because Plaintiff failed to comply with Federal Rule of Civil Procedure 9(b).  Rule 9(b) provides that: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  As the Eleventh Circuit has noted, the purpose of this requirement is to "alert[] defendants to the precise misconduct with which they are charged" and to "protect[] defendants against spurious charges of immoral and fraudulent behavior."  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (applying Rule 9(b) pleading requirement in securities case).

With this purpose in mind, courts have held that "[i]n pleading a false advertising claim" under the Lanham Act, a "plaintiff must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)."  *Fisher & Paykel Appliances, Ltd. v. LG Electronics, Inc.*, No. 03 C 50146, 2003 WL 21910622, at *1 (N.D. Ill. Aug. 7, 2003) (dismissing Lanham Act claim for failure to provide the "when and where" of the alleged false statement); *Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1556 (E.D. Pa. 1985) ("the policies which underlie Rule 9's requirement that the nature of an alleged misrepresentation be pleaded with specificity are equally applicable to the type of misrepresentation claims presented in plaintiffs' Lanham Act claim"); *Sanderson v. Brugman*, No. IP00-459-C-H/G, 2001 WL 699876, at *8 (S.D. Ind. May 29, 2001) (dismissing Lanham Act claims for failure to comply with Rule 9(b)).

Plaintiff plainly has not satisfied Rule 9(b)'s heightened pleading requirements, here.  Indeed, it has failed to provide *any* information whatsoever

regarding what statements McDonald's allegedly made, when it made them, who made them, or their contents.  Instead, Plaintiff simply repeats that McDonald's made unspecified "representations concerning promotional games" during a time period stretching "from 1995 through at least 2001."  (Compl. ¶ 10).  These allegations are insufficient under Rule 9(b).  The fact that there were so many games conducted during this time frame, each with a separate advertising campaign, makes Plaintiff's failure to comply with Rule 9(b) even more glaring.  *See U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000) ("It is hard to imagine how Defendant can respond to an allegation that fraud was committed over a ten year period.  Plaintiff must plead more specifically regarding the time that at least some of the fraudulent claims were submitted so that Defendant may adequately respond to the allegations.").

In addition, requiring Plaintiff to satisfy the requirements of Rule 9(b) is particularly appropriate here, where Plaintiff alleges that a third party embezzled high-value game pieces to the detriment of McDonald's and its customers.  Under Plaintiff's theory, McDonald's advertisements became actionable only *after* this criminal act (as, without the theft, the advertisements would not have been "false").  Because it is clear that the Lanham Act prohibits only "claims that are false or misleading *at the time they are made*" and not those that "later become false" (*Alpo*, 720 F. Supp. at 205 n.12), knowing which specific statements allegedly were false, when they were made, and by whom they were made, is critical to McDonald's ability to respond to Plaintiff's complaint.

In sum, Plaintiff's false advertising claim should be dismissed because Plaintiff has failed to satisfy the heightened pleading requirements of Rule 9(b).

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant McDonald's Corporation respectfully requests that the Court dismiss this case with prejudice.

MORRIS, MANNING & MARTIN, LLP


By: _____/s/ Donald A. Loft_____
     Donald A. Loft (Ga. Bar # 455706)
     Ross A. Albert (Ga. Bar # 007749)

     Attorneys for Defendant

1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Tel:  (404) 233-7000
Fax:  (404) 365-9532


Of Counsel to Defendant:

WINSTON & STRAWN LLP
George C. Lombardi
Illinois ARDC #06187715
David J. Doyle
Illinois ARDC #06224828
35 W. Wacker Dr.
Chicago, IL 60601-9703
Tel:  (312) 558-5600
Fax:  (312) 558-5700
glombardi@winston.com
ddoyle@winston.com

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1D, the undersigned counsel certify that the foregoing brief has been prepared in Times New Roman 14, one of the four fonts and points approved by the Court in LR 5.1C.

This 17th day of April, 2006.

**MORRIS, MANNING & MARTIN, LLP**

__/s/ Donald A. Loft_____
Donald A. Loft (Ga. Bar # 455706)
Ross A. Albert (Ga. Bar # 007749)
MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Tel:  (404) 233-7000
Fax:  (404) 365-9532

Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 17, 2006 I electronically filed the foregoing Memorandum of Law in Support of McDonald's Rule 12(b)(6) Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Irwin W. Stolz, Jr., Esq.
James W. Hurt, Jr., Esq.

and I have also served a copy of the foregoing document on the following attorneys for the Plaintiff who, to my knowledge, are not registered on the CM/ECF system, via e-mail as follows:

David C. Weiner, Esq. (dweiner@ssd.com)
Charna E. Sherman, Esq. (cesherman@ssd.com)
Walter Weir, Jr., Esq. (ww@weirpartners.com)

MORRIS, MANNING & MARTIN, LLP

___/s/ Donald A. Loft_____
Donald A. Loft
Georgia Bar No. 455706

1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, GA 30326
404-233-7000 (phone)
404-365-9532 (fax)

1447064 v02